## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 04 2020, 7:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

S.H., M.H. & C.H. (Minor Children)

and

S.H. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

March 4, 2020

Court of Appeals Case No.
19A-JT-2048

Appeal from the
Marion Superior Court

The Honorable Mark A. Jones,
Judge

The Honorable Peter Haughan,
Judge Pro Tempore

Trial Court Cause Nos.
49D15-1810-JT-1243, 49D15-1810-JT-1244, 49D15-1810-JT-1245

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

**Altice, Judge.**

## Case Summary

S.H. (Mother) appeals from the involuntary termination of her parental rights to her three minor children, Sa.H., M.H., and C.H. (collectively, the Children). She challenges the sufficiency of the evidence supporting the termination order.

We affirm.

## Facts & Procedural History

Mother and R.H. (Father)[1] are the biological parents of Sa.H. born in September 2005, M.H. born in July 2006, and C.H. born in March 2010. In March 2017, Indiana Department of Child Services (DCS) removed the Children when Father and Mother were involved in a domestic dispute and

---

[1] Mother and Father's marriage was dissolved during the course of this action. Father's parental rights were also terminated but he does not participate in this appeal. Accordingly, we will focus on the facts related to Mother.

Father threw an object, which injured M.H., and Father was arrested. Mother and Father were under the influence of illegal drugs and/or alcohol at the time. DCS filed a child in need of services (CHINS) petition,[2] and guardian ad litem Ed Walker (the GAL) was appointed. In April 2017, Mother admitted that the Children were in need of, and the family would benefit from, services designed to eliminate substance abuse and domestic violence from the home and that the Children were CHINS. The Children were placed with maternal grandfather and step-grandmother (Grandparents), where they have remained since that time.

[4] In June 2017, the juvenile court adjudicated the Children as CHINS and entered a dispositional order that substantially adopted the recommendations in DCS's predispositional report. Mother was ordered to participate in home-based counseling, therapy, and supervised parenting time, and keep in touch with her case manager. Mother was required to "submit to random drug/alcohol screens" within one hour of DCS's request. *Exhibits Vol.* at 65, 70. If Mother submitted to ten clean screens from the date of the June 7, 2017 Parental Participation Order, she no longer had to submit to screens, but "[i]f she tests positive for alcohol or any unprescribed substances, DCS shall refer a substance abuse assessment and [Mother] shall follow those recommendations." *Id.* at 70. The juvenile court also ordered that the Children

---

[2] By agreement of the parties, DCS exhibits from the CHINS proceedings were redacted, including the allegations of the CHINS petition, before being admitted into evidence at the termination hearing.

participate in homebased trauma-focused therapy and follow recommendations of the therapist.

[5] In the fall of 2017, Mother participated in homebased therapy with Vicky Brown a licensed mental health therapist and she engaged in homebased case management with Tara Kimbrough, a life skills clinician. Mother was making positive progress and working to obtain housing, and she was permitted unsupervised parenting time. Additionally, Brown began providing therapy to the Children to address post-traumatic stress disorder (PTSD) issues.

[6] Later in 2017, Mother started missing sessions with Brown and Kimbrough and scheduled visitations with the Children. Brown was concerned that the Children were being re-traumatized by Mother's lack of consistency. Around the time of Thanksgiving 2017, Mother became unemployed and missed eight visits with the Children. In December 2017, Brown terminated services with Mother due to lack of participation. Kimbrough also terminated services in December 2017 due to non-compliance, multiple cancellations, and minimal progress. The last time that Mother engaged in parenting time with the Children was around Christmas 2017. DCS Family Case Manager (FCM) Zachary Inman made new referrals for homebased counseling and case management in January 2018, but the new referrals were unsuccessful because the providers could not contact Mother.

[7] In March 2018, DCS requested that the permanency plan change from reunification to adoption. At a March 21, 2018 permanency hearing, Brown

recommended that Mother's parenting time be suspended, observing that she had not attempted to visit with Children in several months. The juvenile court issued an order finding that the Children had been removed from Mother's care for a year, that DCS had made reasonable efforts to make it possible for the Children to return safely to her home but that services "have not been effective or completed [,]" and that Mother had "made no meaningful or appreciable progress toward reunification." *Id*. at 84, 85. The court suspended Mother's parenting time and ordered that DCS need not provide any services for Mother, but noted that "any open services may remain in place." *Id*. The juvenile court found that it would be contrary to the health and welfare of the Children to be returned home and changed the permanency plan to adoption.

[8]  The juvenile court's June 17, 2018 order following a review hearing reflected that DCS objected to any visits and requested that parenting time continue to be suspended and that, if phone calls were to be authorized, then time be allowed for their therapist to speak to the Children prior to the call. The court's order permitted parenting time and phone calls only "upon positive recommendations of DCS, GAL, and service providers." *Id*. at 90. At subsequent review hearings, Mother requested that the permanency plan be returned to reunification, but DCS objected, and the court ordered that the plan continue to be adoption. A Child and Family Team Meeting was held with Mother in July 2018, and, among other things, the team discussed their concerns about Mother's sobriety. The team agreed that they would re-visit the issue of

Mother's visitations with the Children if she submitted to ten screens that were free from alcohol and non-prescription medication.

[9] On October 25, 2018, DCS filed a petition to terminate the parental rights of Mother and Father. A permanency hearing was held in November 2018, and Mother did not attend. As of January 2019, Mother was engaged in homebased counseling but no other services. Mother appeared at a February 2019 permanency hearing and requested that the plan return to reunification, which the trial court denied. On March 27, 2019, Mother filed a motion for increased parenting time, but she did not appear for the April 10, 2019 hearing on the motion. The juvenile court issued an order after the hearing memorializing that DCS objected to "therapeutically supervised visitations," noting that "the screens she has submitted have been positive for alcohol" and that the termination hearing was set for the following week on April 18. *Id*. at 110. The GAL likewise objected to visitations and asked the court to deny Mother's request for increased parenting time. In denying Mother's request, the juvenile court made findings that included: The court's June 2017 Parental Participation Order had ordered drug and alcohol screens; Mother tested positive for alcohol in August 2018, and from August to November 2018 she "took a number of screens, many of which were positive for alcohol"; in eight random screens in February and March 2019 Mother was positive for alcohol and the court did not have results for three others in March 2019; and the Children's therapist "does not recommend [Mother] have parenting time this close to the termination hearing." *Id*. at 110-11.

[10]     The termination trial was held on April 18 and May 30, 2019.  Brown testified to working with Mother on various issues, including Mother's childhood trauma, self-esteem and codependency issues, and substance abuse.  Brown testified that initially Mother was "doing very well" and was "very receptive to services," but that by the fall of 2017, Mother became noncompliant.  *Transcript Vol. II* at 38.  Brown described that Mother became less consistent with her visits with the Children, which at that time were unsupervised, changed jobs, and was engaging in "very unhealthy" and dangerous behaviors, including "frequenting a lot of different males," which DCS considered to be a "self-sabotage" behavior.  *Id*. at 40.  Brown testified that she explained to Mother that when Mother failed to consistently visit with the Children, it was hard on the Children and was compounding their trauma.  Brown also testified that she and Mother had multiple conversations about the fact that Mother was not to consume alcohol.  Brown discharged Mother from services on December 19, 2017 for missed sessions, inconsistency with services, and ten missed visitations with the Children.  Mother never visited with the Children after late December 2017 and by March 2018, Brown's recommendation was that Mother not be permitted to have any visitations.

[11]     In September or October 2017, Brown began providing trauma-focused cognitive behavior therapy to the Children for PTSD, a diagnosis that was based on disclosures by the Children of experiences in the home with Mother and Father involving neglect and abuse, including a lack of food in the home such that Sa.H would give up food so that her siblings could have something to

eat, the Children being subject to "whippings," and Children being left alone overnight at a young age. *Id*. at 67. Brown continued treating the Children until November 2018. Sa.H. also told Brown about "multiple" physical fights between Mother and Father where they argued over which of the two of them drank the last of the vodka. *Id*. at 68. Brown had worked for fifteen years with children who had suffered abuse and neglect and testified that she considered the negative effects of the neglect on Sa.H. "at the very top" of the spectrum. *Id*. at 71. Brown testified that the Children needed consistency, stability, and routine and "they ha[d] never experienced routine" with Mother and Father. *Id*. at 81. Brown testified that the Children were receiving the structure they need with Grandparents. She stated that she had concerns about the Children returning to Mother's care, believing that Mother would continue in "the same patterns" as she had in the past. *Id*. at 83. Her opinion was that the Children should remain with Grandparents.

[12] Grandfather testified that before the Children came to live with him and his wife, they saw the Children only on occasions such as holidays or birthdays because "there was always an excuse." *Id*. at 103. Grandfather recalled that, about a year prior to when the CHINS case began, he had stopped by Mother and Father's home for a visit and saw "liquor bottles laying around everywhere" during the middle of the day. *Id*. at 105. Grandfather said that, prior to the CHINS case, he had talked to Mother about her alcohol use. He also stated that he was concerned "many times" about the Children being left home alone. *Id*. at 105. Grandfather said that Mother and Father moved "all

the time" and lived with Grandparents eight to ten times in a ten-year period because they needed a place to stay. *Id*. at 106. He described that when the Children first came to live with them after their removal, Children were "real thin," seemed "angry," and wet the bed most nights. *Id*. Grandfather said that Mother had visits with the Children for a while but after Christmas Day 2017, "She never called. She never contacted." *Id*. at 108. Grandfather testified that he and his wife wanted to adopt the Children.

[13] Patty Moore, a mental health therapist, testified for DCS. She had been providing therapy for the Children via a DCS referral for approximately six months prior to the termination hearing. She was treating M.H. for hoarding of food, hiding food, and eating quickly out of fear of not having food; Sa.H. for inappropriately taking on adult-like parenting roles; and C.H. for aggression with adults and children. Moore characterized the trauma that the Children had experienced as "[h]orrific." *Id*. at 151. She had concerns that the Children would revert to "survival behaviors," such as lack of boundaries, feeling like they have to care for themselves, and lack of respect for authority figures, if the stability of Grandparents' home was taken away from them. *Id*. Her opinion was that visitation with Mother should not resume and that the Children should remain with Grandparents.

[14] FCMs Zachary Inman and Janelle Baker, who replaced FCM Inman in January 2019, each testified. FCM Inman stated that Mother initially was "doing very well" and she received unsupervised and unrestricted visitations beginning in September 2017. *Id*. at 194. However, between September 2017

and the March 21, 2018 permanency hearing, Mother stopped visiting with the Children, and based on all reports from service providers as well as the GAL, FCM Inman recommended in March 2018 that the permanency plan be changed to adoption. FCM Inman opined that "testing positive for alcohol consistently would show somebody that is — could indicate that somebody is drinking — is unable to stop drinking which could impair their ability to care for the child." *Id*. at 201. He recalled a March 2018 Family and Child Team Meeting where Mother was made aware of "the importance of being clean from alcohol." *Id*. at 208. FCM Inman testified to observing the Children with Grandparents and described them as "very well bonded" with each other. *Id*. at 199. He did not recommend that Mother have more time to develop a stable home for the Children because the case had been pending two years and DCS had not seen "any significant progress" and did not expect that she would "make any progress anytime soon." *Id*. at 204. He testified that it was DCS's position that Mother's parental rights to the Children be terminated. FCM Baker testified that her position with regard to the Children was consistent with FCM Inman's.

[15] The GAL testified that he visited the Children in their placement with Grandparents and observed the interaction between them. His interactions with Mother consisted of meeting her at team meetings and he also received information from providers, but he did not visit with Mother and the Children together. He testified to each child having an education liaison at his recommendation and participating in Life Skills to help them cope with anger

or express themselves. The GAL stated that in his opinion Mother had not dealt adequately with issues that led to the Children's removal, particularly housing and alcohol abuse. After considering services offered to Mother, her level of engagement, progress reports, the wishes of the Children, and the effect of reunification on the Children, the GAL recommended adoption as the permanency plan for the Children.

[16] Homebased caseworker Cristal Redd also testified. Redd began working with Mother in March 2018, when Mother's boyfriend J.C. (Boyfriend) talked to Redd – who was working with Boyfriend on his own CHINS matter – about Mother's situation. DCS eventually made a referral for Redd to provide services to Mother, and Redd worked with Mother toward finding employment and housing. Redd testified that Mother consistently engaged in services and was on time and prepared. Redd stated that Mother obtained employment and was living with Boyfriend, his mother, his grandmother, and sometimes his children. Redd testified that she participated in a Child and Family Team Meeting at which it was discussed with Mother "not to engage" in consuming any substances at all including alcohol. *Id.* at 177.

[17] Mother testified that her mother died in April 2017 and it was hard on her, that she participated in DCS services when the Children were removed, and that visitations went well. She said that after visitations were suspended in March 2018, she on many occasions requested phone calls and sought parenting time. She testified to being enrolled in EMT school (six hours per week) since January 2019 but not being currently employed. Mother also testified to having

lived in a stable home for one year with Boyfriend at his grandmother's home. She stated that she began a relationship with him in December 2017 and that he would be a part of the Children's lives were she to be re-unified with them. Mother acknowledged that she visited the Children's school once in an attempt to see them and had texted with M.H., both in violation of court order.

[18] Mother also called as witnesses her aunt Jeannie Fisher and Boyfriend. Fisher had known Mother her whole life and had seen the Children interact with Mother. Fisher testified that the Children "were happy" with Mother and described that Mother had "changed her life around" since DCS became involved, as she divorced Father, was not drinking alcohol, and was living in a four-bedroom home with Boyfriend, who Mother planned to marry. *Transcript Vol. III* at 4, 6. Fisher testified that she "pray[ed] . . . that [Mother] gets her kids back because those kids couldn't ask for a better mother." *Id*. at 4.

[19] Boyfriend testified that he and Mother had been together for one and one-half years, that she was in school, and that she has a good relationship with his three children, of whom he has shared custody, but he had never observed Mother interact with the Children. Boyfriend discussed being clean from heroin for about one and one-half years and indicated that he occasionally drank alcohol. He stated that Mother no longer drank and estimated that he had not been to a bar for drinks with Mother in "a few months." *Id*. at 33. Boyfriend acknowledged his criminal history that included convictions for "drunk driving," operating a vehicle while being a habitual traffic offender, "many"

violations of probation, and a 2017 conviction for unlawful possession of a syringe. *Id.* at 28, 29.

[20] On August 2, 2019, the juvenile court entered a detailed order terminating Mother's parental rights to the Children, concluding that (1) the conditions that led to the Children's removal or placement outside the home were "her lack of stability with housing and employment and her issues with substance abuse and alcohol use" and that there was a reasonable probability that the conditions would not be remedied; (2) she continued to drink alcohol even though "she was aware of the impact it might have on her Children" and the continued parent-child relationship posed a threat to the Children's well-being; (3) termination was in the Children's best interests; and (4) DCS had a plan for the Children, namely adoption by Grandparents. *Appellant's Appendix Vol. II* at 43, 44. The court elaborated:

> The [C]hildren are safe and secure in their current preadoptive placement with [Grandparents]. . . . The service providers and the GAL believe that adoption by [G]randparents is in the [C]hildren's best interest. Neither parent has demonstrated a willingness or ability to do what it takes to parent their [C]hildren. Neither parent can provide their [C]hildren with a safe and stable long-term home that will protect the [C]hildren and provide them with the permanency that they need.

*Id.* at 45. Mother now appeals.

## Discussion & Decision

[21] When reviewing the termination of parental rights, we consider the evidence in the light most favorable to the prevailing party, and we will not reweigh the evidence or judge the credibility of the witnesses. *Matter of M.I.*, 127 N.E.3d 1168, 1170 (Ind. 2019). To prevail, the challenging party must show that the court's decision is contrary to law, meaning that the probative evidence and reasonable inferences point unerringly to the opposite conclusion. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014).

[22] It is well recognized that a parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

On appeal, Mother contends that DCS failed to present clear and convincing evidence that the conditions resulting in the Children's removal or the reasons for placement outside the home would not be remedied, that the continuation of the parent-child relationship poses a threat to the Children's well-being, and that termination is in the best interests of the Children. We will address each of these in turn, as needed.

## *Conditions Not Remedied*

[25]     Mother contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied.  In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions.  *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.  The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children.  *Id*.  "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change."  *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied, cert. denied* (2002).  The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home.  *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013).  "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve."  *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

[26] Mother argues that the trial court's order identified "lack of stability with housing and employment, and her issues with substance abuse and alcohol use" as the conditions that would not be remedied but that "Children were not removed because Mother did not have a stable job or housing" and, rather, were removed due to the incident of domestic violence when parents were intoxicated on drugs and alcohol, which she claims "[she] did remedy." *Appellant's Brief* at 15, 17. Therefore, she contends, the trial court's conclusion was erroneous and should be set aside. We reject this argument.

[27] First, Mother did not, as she claims, remedy all the reasons for the initial removal. She was directed to not consume alcohol; she failed to do that. Second, our inquiry focuses not only on the conditions that caused removal, but also on the reasons for Children's continued placement outside the home. *See In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005) ("it is not just the basis for the initial removal that may be considered . . . but also those bases resulting in the continued placement outside of the home"), *trans. denied*. Here, while the Children were initially removed due to domestic violence and use of alcohol and drugs, their continued placement outside the home was due to Mother's lack of stable housing, lack of stable employment, and her continued use of alcohol.

[28] The record reflects that, while Mother initially engaged in services and made progress, she stopped consistently visiting the Children in November and December 2017, and she was terminated from services in December 2017 for noncompliance. FCM Inman referred more services in January 2018, but the

providers were never able to make contact with Mother. According to Brown, who provided homebased therapy to Mother and, separately, to the Children, the negative effects of the neglect on Sa.H. were "at the very top" of the spectrum, the Children had "never experienced routine" with Mother, and Brown was concerned with returning the Children to Mother's care, believing that Mother would continue in "the same patterns" as she had in the past. *Transcript Vol. II* at 71, 81, 83. Brown testified to concerns over Mother's behavior with men, namely "frequenting a lot of different males," a behavior that Brown considered dangerous and unhealthy. *Id*. at 40. While Mother urges that, by the time of the termination hearing, she had been living in stable housing for a year with Boyfriend – which she notes DCS "never bothered" to inspect – DCS providers and the GAL testified to having concerns with Boyfriend, including but not limited to his criminal history, lack of a driver's license, lack of a stable job, and a CHINS history with his children. *Transcript Vol. III* at 12. DCS thus did not consider Mother's housing stable.

[29] FCM Inman stated that DCS had not seen any significant progress and recommended termination. FCM Baker agreed. The GAL likewise believed that Mother had not dealt adequately with issues that led to the Children's continued removal, particularly housing and alcohol use. In sum, Mother did not fully engage in services or make the progress necessary to return the Children to her care.

[30] The trial court's determination that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for their

placement outside Mother's home will not be remedied is supported by clear and convincing evidence. Because I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not review the trial court's determination that continuation of the parent-child relationship posed a threat to the Children's well-being.

### Best Interests

Mother also asserts that the evidence was insufficient to support the trial court's determination that termination was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

Mother takes issue with the statement in the court's order that "[t]heir lives are much better than they ever were when they were in the care and custody of

their parents." *Appellant's Appendix Vol. II* at 45. We agree that a parent's right to his or her child may not be terminated solely because there is a better place for the child to live; however, here, the record reflects, and the trial court's order identified, other bases to support the determination that termination is in the Children's best interests. Indeed, the trial court found that "[n]either parent has demonstrated a willingness or ability to do what it takes to parent their children" and "[n]either parent can provide their children with a safe and stable long-term home that will protect the children and provide them with the permanency that they need." *Id.* at 45.

[33] The record supports these determinations. Mother was ordered to, but did not, stop consuming alcohol, although this requirement was discussed with her at Child and Family Team Meetings and by providers. She voluntarily quit visiting the Children regularly in November 2017, although she was told that such was compounding the Children's trauma. Her last visit with them was in December 2017. Therapist Moore, who was providing therapy for the Children for six months prior to the termination hearing, characterized the trauma that the Children had experienced with their parents as "[h]orrific," and she was concerned that Children would revert to "survival behaviors" if the stability, which they currently were enjoying with Grandparents, would be taken away from them. *Transcript Vol. II* at 151. Her opinion was that it was in the Children's best interests for them to remain with Grandparents. FCM Inman testified that he believed it was in the Children's best interests to terminate the parent-child relationship. The GAL, based on the Children's best interests that

he was appointed to represent, recommended termination and adoption. Considering the totality of the evidence, we conclude that DCS presented sufficient evidence to show by clear and convincing evidence that termination was in the best interests of the Children.

[34]     Judgment affirmed.


Robb, J. and Bradford, C.J., concur.